SOMMERVILLE, J.
Plaintiffs declare upon a contract of lease to defendant of oil land in the Caddo oil field; and they attach to and make part of their petition the said contract.
The contract employs terms indicating that it is both a lease and a sale. It has features common to either or both of said contracts; and at times plaintiffs and defendants argue that it is a lease, and at other times that it is a sale. The nature of the contract indicates that it is neither a lease nor a sale.
Defendant in its answer refers to the contract as a mineral contract. It further answers that plaintiffs failed to deliver to it all of the land which they had undertaken to deliver under the contract between them; that the two wells for which plaintiffs are claiming royalties in this suit are located upon portions of land which the plaintiffs failed to deliver into the possession of the defendant; that of one portion of said land S. W. Mason and W. W. Mason had taken actual possession before the date of the contract between plaintiffs and defendant; and that J. G. Gibbs and others had taken possession of the other portion; that the Masons and Gibbs were locators under the placer mining laws of the United States; that said locators claimed that the property upon which they had located belonged to the United States, and that it is subject to mineral locations as such; that it, defendant, entered into separate contracts with the Masons and Gibbs, and that oil has been produced from said land. Defendant further alleges that it paid $50,000 in cash to plaintiffs under the contract, that plaintiffs agreed to deliver into its possession 100.42 acres of land, and that only 79 acres were delivered to it.. Defendant reconvenes, and claims from plaintiffs the sum of $10,665.23 *181 for failure on their part to deliver all of the land contracted for.
The Masons and Gibbs intervened, and asked that plaintiffs’ demand be rejected, and that they be recognized as owners of the respective portions of land claimed by them under their locations; and, further, asked that defendant be declared to possess the pieces of property as their tenant, and that they be quieted in the possession of the said lands.
Plaintiffs moved to dismiss the petitions of interveners, to strike them from the record, and excepted to the petitions on the ground that they showed no cause or right of action. The motions and exceptions were overruled; and plaintiffs answered, asking that interveners’ demands be rejected, and that they be forever barred from setting up any claim or title to the property, or to any of the royalty of minerals accruing therefrom.
There was judgment in favor of the defendant and interveners rejecting plaintiffs’ demands; there was further judgment in favor of the defendant, and against plaintiff, on the reconventional demand, for $10,665.-23. Plaintiffs have appealed.
[2] Gas and oil leases and contracts, are a part by themselves. There is scarcely any comparison between them and the ordinary farm or house lease, although there is some resemblance in them to coal or solid mineral leases. The Code is silent as to such contracts; for the reason, doubtless, that minerals under and within the soil of Louisiana were not in the contemplation of the lawmakers at the time that the Code was adopted. The Legislature up to this time has been silent upon the subject of mineral rights and contracts. The law with reference to sales and leases found in the Oode cannot be unreservedly applied to these contracts. Such contracts partake of the nature of both sale and lease, and they have features which are not applicable to either.
The lease or contract under consideration has all of the features of the ordinary oil or gas lease or sale — the right of the one party to go upon the land of another party for as long a time as gas or oil may be found in paying quantities; the paying of royalties, or a part of the oil produced, as a consideration; and so much for each gas well, with the right of the lessee or grantee to drill wells to lay pipes and carry off the gas and oil, and to do other acts not necessary to be mentioned here.
In determining the scope and legal effect of an instrument giving rights and privileges to mine or take minerals, oil, or gas, it is immaterial by what name it is called; whether a lease, license, sale, contract, grant, deed of conveyance, a real right, an incorporeal hereditament, a chattel interest, a chattel real, a right in land, or other name; the court will look to the language used in the instrument, aside from these terms so used, and determine its legal effect. The most commonly used term is the word “lease,” although the other terms given above have been used by the courts.
In the case of Cooke v. Gulf Refining Co., 127 La. 592, 53 South. 874, we considered a contract like the one under consideration, for the purposes of that case, as a lease. In the case of R. F. Wadkins v. Atlanta & Shreveport Oil & Gas Co., we held the contract therein denominated a sale as a real right, and sustained a plea of prescription for nonuser; this latter finding is in line with the decision of the Supreme Court of the United States in Ohio Co. v. Indiana, 177 U. S. 190, 212, 20 Sup. Ct. 576, 585 (44 L. Ed. 729), which says:
“In view of the fact that regulations of natural deposits of oil and gas and the right of the owner to take them as an incident of title in fee to the surface of the earth, as said by *183 the Supreme Court of Indiana, is ultimately but a regulation of real property,” etc.
[3] Oil and gas, until severed from the realty, are as much a part of it as coal or stone. So long as they remain in the ground outside of an artificial receptacle at least, as the casing of a well or a pipe line, they must be treated as a part of the realty underneath the surface where they lie. The owner of the surface is the owner of the oil and gas beneath it; but, if they escape into the land of another, he ceases to be the owner of them. They are the subjects of contract, very similar to grants or conveyances of coal or stone buried in the soil of the same tract of land.
In seeking for analogous conditions in the law, courts have compared natural gas and oil to that of animals feraj naturas. The Supreme Court of Pennsylvania made this comparison in a case that has become a leading authority wherever the subject of gas and oil is discussed.
“Water and oil,” said the court, “and still more strongly gas, may bo classed by themselves, if the analogy be not too fanciful, as minerals ferse naturas. In common with animals, and unlike other minerals, they have the power and tendency to escape without the volition of the owner. Their ‘fugitive and wandering existence within 'the limits of a particular tract is uncertain.’ They belong to the owner of the land, and are a part of it, and are subject to his control; but when they escape, and go into other land, or come under another’s control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas. If an'adjoining or even a distant owner drills his own land, and takes your gas, so that it comes into his well and under his control, it is no longer yours but his.”
It has been said repeatedly by the courts and writers that the owner of the soil owns the gas and oil beneath its surface; and expressions to this effect will be found in Thornton’s work on the Law Relating to Oil and Gas! This is an acknowledgment of the absolute ownership of the gas and oil beneath the surface by the owner of the land. But, under the Indiana decisions, which have met with the approval of the Supreme Court of the United States, the owner of the land has only a qualified right to the oil and gas beneath the surface — the rights to reduce it to possession and to exclude all others exercising the right on the premises — and title in him to it does not vest until he has reduced it to actual possession, either by bringing it into a well or into a pipe line, or into a tank or other receptacle in case of oil. Until that had happened the gas or oil by natural forces may escape from his land, be reduced to possession by another, and become his property. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Thornton, § 18 et seq. In the opinion in 177 U. S. 190, 202, 20 Sup. Ct. 576, 581 (44 L. Ed. 729), the court asked the question:
“Does the peculiar character of the substances, oil and gas, which are here involved, the manner in which they are held in their natural reservoirs, the method by which and the time when they may be reduced to actual possession or become the property of a particular person, cause them to be exceptions to the general principles applicable to other mineral deposits, and hence subject them to different rules?”
The court answered:
“True it is that oil and gas, like other minerals, are situated beneath the surface of the earth, but except for this one point of similarity in many other respects they greatly differ. They have no fixed situs under a particular portion of the earth’s surface within the area where they obtain. They have the power, as it were, of self-transmission. No one owner of the surface of the earth within the area beneath which the gas and oil move can exercise his right to extract from the common reservoir in which the supply is held, without, to an extent, diminishing the source of supply as to which all other owners of the surface must exercise their rights. The waste by one owner caused by a reckless enjoyment of his right of striking the reservoir, at once, therefore, operates upon the other surface owners. Besides, whilst oil and gas are different in character, they are yet one, because they are unitedly held in the place of deposit.”
In the case of Brown v. Spilman, 155 U. S. 665, 669, 670, 15 Sup. Ct. 245, 247 (39 L. Ed. 304) these distinctive features of deposits *185 of gas ánd oil were remarked upon. The court said:
“Petroleum gas and oil are substances of a peculiar character and decisions in ordinary cases of mining, for coal and other minerals which have a fixed situs, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are a part of it, so long as they are on it or in it, or subject to his control, but when they escape and go into other land, or come under another’s control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas, extending under his neighbor’s field, so that it comes into his well, it becomes his property.” (Citing authorities.)
The Supreme Court in 177 U. S. 190, 208, 20 Sup. Ct. 576, 583 (44 L. Ed. 729), proceeded to compare decisions of the Pennsylvania and Indiana Supreme Courts with its own opinions on this subject, as follows:
“Without pausing to weigh the reasoning of the opinions of the Indiana court to ascertain whether they in every respect harmonize, it is apparent that the cases in question, in accord with the rule of general law, settle the rule of property in the state of Indiana, to be as follows: Although'in virtue of his proprietorship the owner of the surface may bore wells for the purpose of extracting natural gas and oil until these substances are actually reduced by him to possession, he has no title whatever to them as owner. That is, he has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession. It is also clear from the Indiana cases cited that in the absence of regulation by law every owner of the surface within a gas field may prosecute his efforts, and may reduce to possession all or every part, if possible, of the deposits without violating the rights of the other surface owners.
“If the analogy between animals feris naturae and mineral deposits of oil and gas stated by the Pennsylvania court and adopted by the Indiana court, instead of simply establishing a similarity of relation, proved the identity of the two things, there would be an end of the case. It follows because things which are ferse naturse belong to the ‘negative community’; in other words, are public things subject to the absolute control of the state, which, although it allows them to be reduced to possession, may at its will not only regulate but wholly forbid their future taking. Geer v. Connecticut, 151 U. S. 519, 525 [16 Sup. Ct. 600, 40 L. Ed. 793]. But, whilst there is an analogy between animals ferse naturse and the moving deposits of oil and natural gas, there is not identity between them. Thus the owner of the land has the exclusive right on his property to reduce the game there found to possession, just as the owner of the soil has the exclusive right to reduce to possession the deposits of natural gas and oil found beneath the surface of his land. The owner of the soil cannot follow game when it passes from his property; so. also, the owner may not follow the natural gas when it shifts from beneath his own to the property of some one else within the gas field. It being true as to both animals ferse naturse and gas and oil, therefore, that whilst the right to appropriate and become the owner exists proprietorship does not take being until the particular subjects of the right become property by being reduced to actual possession. The identity, however, is for many reasons wanting. In things ferse naturse all are endowed with the power of seeking to reduce a portion of the public property to the domain of private ownership by reducing them to possession. In the case of natural gas and oil no such right exists in the public. It is vested only in the owners in fee of the surface of the earth within the area of the gas field. This difference points at once to the distinction between the power which the lawmaker may exercise as to the two. In the one, as the public are the owners, every one may be absolutely prevented from seeking to reduce to possession. No divesting of private property under such a condition can be' conceived because the public are the owners, and the enacting by the state of a law as to the public ownership is but the discharge of the govermental trust resting in the state as to property of that character. Geer v. Connecticut, supra. On the other hand, as to gas and oil, the surface proprietors within the gas field ¿11 have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate,” etc.
In discussing the nature of a contract similar in all respects to the one now under consideration in this case, the Indiana court said in Heller v. Dailey, 28 Ind. App. 555, 63 N. E. 490:
“While, for reasons which we have sought to state, we do not regard the contract in suit as a grant of land, or as a lease properly so-called, but do regard it as a grant of a right in the nature of an incorporeal hereditament, operative from the time of its execution and during the accomplishment of its purpose as a transfer of an exclusive right to search for, take, and appropriate the minerals mentioned in the instrument, under whatever technical common-law term it may most properly be classed, it must be held to be a conveyance of *187 an interest in land within the meaning of our statutes.”
In discussing the nature of the grant or contract, the court used the following language: _
“The grant is not limited to any period of time, though, as in the case of a grant of the coal in certain land, it would cease to be operative whenever it should be found that no oil or gas was beneath the soil, or none that could be taken with benefit; whereas a lease of land, properly so called, would continue in force according to its provisions until the end of the term. The contract is in effect a grant of the right to take all the oil and gas that may be found and taken by making wells as prescribed upon the particular tract of land, with accompanying incidental rights to do, as indicated in the contract, upon the surface, those things needed for the enjoyment of the principal right so as to take oil and gas. It confers rights not limited as to time, unless it be as to the indefinite period within which oil or gas may be taken advantageously under the conditions prescribed. The right to take all the oil and gas in and under the land is in its nature an exclusive right. It is inconsistent with a right in the grantor or others under him to take any of the oil or gas from beneath the designated land, at least through wells drilled upon that land. The oil and gas in their free and natural state within the land constitute a part of it, though they be fluent and liable to depart to other land, there to be taken into possession through wells made for such purpose. The right to take such minerals from the land constitutes an interest in the land. The instrument under consideration does not create a mere personal privilege to take the minerals from the land. It is an exclusive and assignable interest in land. If with propriety it can be called a license, it must be a license coupled with an interest in land. By its terms the contract is a grant of the minerals in and under the land. If by such general terms all of the specified solid mineral, as coal, in and under the land were granted, it would be a grant of real estate; * * * but because of the fluidity and fugitiveness of petroleum and natural gas the absolute ownership of these minerals substances within the land cannot be acquired without reducing them to actual control, so that a distinction must be and is made between these elusive minerals in and under the ground and the solid minerals in place in the earth. Therefore a grant of all the oil and gas in and under a tract of land is not a grant of any particular specific substance as would be a grant of the coal in and under certain land. The owner of land is not by virtue of his proprietorship thereof the absolute owner of the oil and gas in and under it in its free and natural state, not yet reduced to actual control of any person, but he together with the other owners of land in the gas field has a qualified ownership, consisting of or amounting to his exclusive right to do what may be done on, through, and under his land (as making of wells) necessary to reduce the minerals to his possession, and by thus acquiring the exclusive .control to become the owner of the mineral substances as his personal property, observing due regard in his operations to the like enjoyment of such exclusive right by all other landowners in like circumstances. This exclusive right is his private property. He cannot grant more than he owns; therefore, by granting all the oil and gas in and under his land, he does not grant more than a right to reduce to ownership the oil and gas which may be obtained by operating on the land, whereby substances which at the time of the making of the grant may be in and under lands of other surface properties may come into rightful ownership of the grantee as his personal property. Though,' because of the peculiar nature of oil and gas, a corporeal interest in them in place cannot be created, and title to the specific mineral substances cannot be acquired without the reduction of them first to personal property, yet the exclusive and assignable right to do this with the accompanying rights necessary to such accomplishment constitutes, not a privilege revocable before it has been acted upon, but a subsisting, exclusive, assignable, and irrevocable right which accrues upon the execution of the written instrument of conveyance and before any action has been taken thereunder. The right so created is not susceptible of livery of seizin, and is in the nature of an incorporeal hereditament. * * * The contract before us cannot be regarded as a lease of'land for three years or less, or as a lease of land ineffectual because of uncertainty or indefiniteness of duration of term, and occupancy thereunder cannot be' regarded as a tenancy from year to year; but the interest granted is properly to be considered as an interest in land within the meaning of our statutes.”
So, when plaintiffs urge that defendant is estopped to deny their ownership in the land in question, on the ground that defendant is the tenant of plaintiffs, we are constrained to hold that the well-recognized rules of law existing between landlord and tenant cannot apply in this case; for two reasons, that:
(1) Plaintiff did not put defendant in possession of the property, or rather that portion of the property, which was in the possession of Messrs. Mason and Gibbs, as locators under the placer mining laws of the United States; and
(2) Plaintiffs did not exclusively own, or *189 deliver to defendant, the oil and gas which were beneath the surface of their land. The fugitive and wandering existence of oil and gas under plaintiffs’ land rendered delivery impossible, until the oil and gas had been reduced to possession.
[4] “The rule that a tenant cannot deny his landlord’s title does not embrace an oil or gas lease which the lessor had no right to give, if neither the lessee nor his assignees took possession or executed any powers or rights under it.”
“If a lessee take a second lease of the premises from the person claiming adversely to the first lessor, he cannot refuse to pay rent under the second lease on the ground that the first lessor had the better title.” Thornton, § 122; 24 Oyc. 937.
The evidence also shows that plaintiffs' have failed to exercise any possession in and to the land for more than 10 years. They did not have actual, constructive, or civil possession of any of the land at the time of making the lease to defendant; and under article 3444, C. C., they have lost their right of possession as against third parties in actual possession with equitable titles, and who have made claims upon the United States government under the acts of the Congress.
There is an old graveyard on the land, but that appears to have been placed there in the time of plaintiffs’ grandfather, while he held title from the United States government, which title was surrendered by the administratrix of his succession, who received the purchase price from the government, and the title was canceled.
[5] The motion and exception on the part of plaintiffs to the interventions of the Masons and Gibbs on the ground that this is an action for rent, and that they could not be heard to assert any rights which they might have, were properly overruled.
“The judge cannot refuse to admit an intervention; but he must pronounce on its merits at the same time that he decides the principal action; if the demand be not sustained, the person intervening shall be decreed to pay the incidental costs.” Code Prac. art. 394. “The plaintiff in intervention must institute his demand before the court in which the principal action has been brought; being considered as plaintiff, he must follow the jurisdiction of defendant.” Id. art. 392. “The intervention must be formed by a petition. * * * This petition must be served on the party against whom it is directed, in order that he may answer to the same in the delay given in ordinary suits.” Id. art. 393.
A form of action cannot control the right to intervene. State v. Capdevielle, 122 La. 615, 622, 48 South. 126; State ex rel. Southern Bank v. Pilsbury, 31 La. Ann. 1.
Persons claiming a real right to land which has been leased to the defendant in a cause may intervene in said cause. Code of Prac. arts. 392, 393, 394; State v. Capdevielle, 122 La. 615, 48 South. 126; State ex rel. Southern Bank v. Pilsbury, 31 La. Ann. 1; Yazoo & N. V. R. R. v. Clarke, 120 La. 1044, 46 South. 17.
The Masons and Gibbs, interveners, ask that they be recognized as owners of the two pieces of ground claimed by them in their petitions, and plaintiffs, in their answers, ask that they be recognized as the owners thereof.
Plaintiffs say that these two pieces of ground in contest between them and interveners form parts of the property leased by them to defendant, the whole of which land is described in the lease as follows:
“The north half of the northeast quarter of section five, township twenty, range sixteen, in the southwestern land district of Louisiana, containing 100.42 acres, according to official map on file in the United States Land Office; said land being situated in the parish of Caddo, state of Louisiana; being the same land conveyed by R. B. Bonham to J. J. Reeves by deed recorded in conveyance Book V, p. 1199 of the records of said parish.”
While interveners say that said lands are located in the S. % of said quarter section.
The claims of interveners are correct. The portions of land claimed by them are located in the S. % of the N. E. % of section 5.
The evidence shows that the government of the Unitéd States made two surveys of the *191 N. y2 of the N. E. % of section 5; and it does not appear that the government has made any survey of the land in the S. % of the N. E. % of section 5. And interveners contend that title to the lands in the S. % of said section is still in the government.
Plaintiffs contend that the 22 acres lying in the S. % of section 5 contiguous to their land in the N. % of said section form parts of the land which their ancestors in title acquired from, the state of Louisiana.
The two surveys of the land in question were made in 1839 and in 1846. In the first survey of the N. y2 of the N. E. % of section 5 is shown to contain 66 acres, 39 acres in the fractional N. W. % of the N. E. %, and 27 acres in the fractional -N. E. % of the N. E. %. This survey also shows land in the S. % of the N. E. % of section 5, lying south of the' arm of the lake running through the said N. E. %. These lands, together with other lands in the immediate vicinity, were sold by the government to John J. Reeves, the grandfather of plaintiffs. But in 1841, when the line of demarcation between the republic of Texas and the United States was laid, it showed that a portion of township 20, range 16, including nearly all of the property sold to Reeves, was in Texas, and not in Louisiana. And in 1846 the second survey was made of the land in section 5, now belonging to plaintiffs. After the death of John J. Reeves, his widow, under the law, made application for return of the money invested by her husband in the lands referred to, and the money was returned to her as the administratrix of her husband’s succession, and it was divided among the heirs. This cancellation of sale by the government, and the return of the money to the administratrix of the succession of John J. Reeves, included the property involved in this suit. So that plaintiffs claim nothing, or can claim nothing, under the title of their grandfather, John J. Reeves. A record of the patent had been made, but the patent was not delivered to John J. Reeves, and the record of the sale was canceled.
On July 24, 1854, the state of Louisiana submitted for approval, under the Swamp Land Act of 1849 (Act March 2, 1849, c. 87, 9 Stat. 352), among other lands, the following: The N. y2 of the N. E. *4 of section 5, township 20, range 16, containing 66 acres; and the list so submitted by the state was approved by the Secretary of the Interior.
The act of 1849 under which the approval was made, differs from the act of 1850 (Act Sept. 28, 1850, c. 84, 9 Stat. 519), in that the acquisition' of swamp lands is initiated by the state filing its application; whereas, under the act of 1850, the United States takes the initiatory steps, and the title passes by the state’s approval of lists, instead of by patent. The second survey of the land divided it into lots 1 and 2; but the state, perhaps in ignorance of the existence of a second survey, acted upon the first survey made, in 1839, and adopted the acreage of the N. y2 of the N. E. %, namely, 66 acres. The approval of the list prepared by the state therefore vested in the state the fee-simple title to the N. y2 of the N. E. % of section 5, containing 66 acres, and did not carry title with it to the 21 acres in the S. y2 of the N. E. % of section 5, which is claimed by interveners. Gleason v. White, 199 U. S. 54, 25 Sup. Ot. 782, 50 L. Ed. 87.
In 1874 the state of Louisiana permitted E. G. Bonnham to enter 100.40 acres of land in the N. y2 of the N. E. % of section 5, although the state did not issue a patent therefor. Plaintiffs derive their title from Bonn-ham. This application and entry were made in disregard of the entry of the state under the Swamp Land Act of 1849; but were made under the' second survey made for the government in 1846. The state of Louisiana thus undertook to convey property to which it had no title, and which belonged to an *193 other; apparently, the United States government. But this is a matter to be decided by the United States government. Plaintiffs show no title thereto; and they cannot collect rent therefor.
[6] Plaintiffs argue that the interveners, who have located on the land in question, and who have done all those things which are necessary under the placer mining laws of the government to acquire titles to mineral lands, cannot be heard in a court of justice to set up claims which the United States government itself is not making. We have held to the contrary in the case of Producers’ Oil Co. v. L. Hanszen et al., 61 South. 754, 132 La. 691. Such a locator has an equitable title, one in expectancy, which the court will recognize until the government of the United States has acted thereupon. Lands of the United States containing oil are subject to location in the same manner as are other mineral lands. Thornton, § 309; Act Feb. 11, 1897, c. 216, 29 Stat. 526; 2 Rev. St. Supp. 549 (U. S. Comp. St. 1901, p. 1434).
On the reconventional demand of defendants against plaintiffs: Under the terms of the lease defendant company paid to the plaintiffs $50,000, and also agreed to pay certain royalties. Defendant now sues plaintiffs for a portion of said cash payment, for the reason that it has been put in possession by plaintiffs of only 79 acres, where the lease calls for 100.42 acres. We have heretofore observed in this opinion that the laws with reference to lease and sale are not entirely applicable to mineral contracts or leases or sales. And, because it does not appear clear from the instrument itself that the cash paid by defendant to plaintiffs was the value of the land agreed upon between them, we are of the opinion that defendant cannot recover on its reconventional demand. It is quite clear that the sale and purchase of the land itself were not the objects of the contract; but, rather the objects were the granting to defendant the rights to enter thereupon and to extract oil and gas from below the surface of the land. It was impossible to say in advance, and it is impossible to say now, what this real right to extract oil from below the surface of the earth was worth, if it was worth anything at all at the date of the contract. We cannot determine what portion, if any, of this cash price should be returned to defendant.
[7] Mr. Thornton, in his work, asserts that oil and gas leases are construed most strbngly against the lessee and in favor of the lessor, citing authorities at page 103.
Defendant in the present case had plaintiff’s title to the land examined before it paid the $50,000 agreed upon; and it was informed that plaintiffs did not own the land in the S. y2 of the quarter section referred to. Nevertheless, it paid the stipulated price, without protest of any kind; and it paid regularly to plaintiffs the royalty agreed upon between them in this lease on the oil flowing from the wells which were drilled upon the property of the plaintiffs in the N, y2 of said section. Defendant entered into leases with the Masons and Gibbs, and took possession of the land under said leases, drilled wells thereon which produced oil, and paid royalties to the Masons and Gibbs, interveners, without notice of any kind to the plaintiffs. This condition of affairs existed for more than a year before this suit was brought by plaintiffs. Defendant has thus construed the contract between it and the plaintiffs, and we shall adopt the construction of both defendant and plaintiffs to the lease, and dismiss defendant’s reconventional demand for the return of a portion of the price paid by defendant to plaintiffs at the time of the making of the lease.
As plaintiffs have not shown a clear, title to the land in controversy, and interveners have only equitable titles therein, and as *195 the government of the United States appears to have had title to the said land when this suit was filed, we are unable at this time to determine the question of title between plaintiffs and interveners.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed, dismissing plaintiffs’ suit, and that it be reversed in other respects; that defendant’s reeonventional demand be denied and dismissed.
It is further ordered: That the equitable titles of interveners Sam W. Mason, M. W. Mason, W. V. Gibbs, O. G. Gibbs, F. Gibbs, and J. B. Piles to the land in question as locators under the placer mining laws of the United States government be recognized, and that their petitions of interventions be denied in all other respects.
That the costs of the trial court be paid by plaintiffs, and those of this court by defendant and interveners.
PROVOSTY, J., dissents.