152 So.2d 619 (1963)
Owen ADAMS et al., Plaintiffs-Appellants,
v.
Jack W. GRIGSBY, Defendant-Appellee.
No. 9914.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1963.
Rehearing Denied April 25, 1963.
Certiorari Refused June 14, 1963.
*620 Goode & Dietz, Shreveport, for appellants.
Phillips, Risinger & Kennedy, Shreveport, for appellee.
Before HARDY, AYRES and GLADNEY, JJ.
HARDY, Judge.
This is an action by the thirteen plaintiffs for injunctive relief, coupled with claims for damages. Defendant interposed an exception of no cause of action, which was sustained, whereupon plaintiffs supplemented and amended their original petition. The exception of no cause of action was re-asserted and from judgment sustaining the exception and dismissing plaintiffs' suit, they prosecute this appeal.
Plaintiffs are property owners residing with their families in or near an area known as Lawton Acres Subdivision, located primarily in Section 30, Township 17 North, Range 15 West, Caddo Parish, who obtained fresh water for their respective personal needs and uses from individual water wells drilled into the fresh water sands of the Wilcox formation between the depths of 150 and 250 feet. Defendant is an oil operator engaged in the secondary recovery of oil and casinghead gas from a unitized formation located in the Greenwood-Waskom Field of Caddo Parish and authorized by order of the Department of Conservation to conduct water flooding operations for the recovery of such minerals in the said field by means of the injection of water into the unitized formation. The source of supply for the water used by defendant for the above stated purpose is obtained from a well located in the Southwest Quarter of Section 20, Township 17 North, Range 15 West, Caddo Parish, which water supply well was completed in the fresh water sands of the Wilcox formation.
The basis of plaintiffs' complaints are found in the allegations that defendant's withdrawal of water from the Wilcox sand to the extent of some 2,000 to 2,800 barrels a day from December, 1961, through June, 1962, is depleting the subterranean fresh water reservoir which supplies the homes of plaintiffs, has caused special damages to some of the plaintiffs in the nature of adding pipe, cleaning wells, replacing pumps, etc., and additional extensive damages attributable to the decrease in value of the properties of the respective plaintiffs. Plaintiffs further asserted that the Wilcox formation is the only available source of fresh water supply in the area in which their properties are located; that said formation *621 is limited in the quantity of fresh water available, and that while the exact delincation and formation of the body of fresh water supplied from the Wilcox sand is not precisely known, it is believed to be either in the nature of an underground stream or a body of sand saturated with water.
The above are the material factual allegations found in plaintiffs' original and supplemental pleadings. While plaintiffs alleged that the action of defendant is "* * intentional, unreasonable and unnecessary or, in the alternative, * * * negligent, reckless or ultra-hazardous," it is obvious that this allegation is a conclusion unjustified by any factual averments. The only additional allegation of the pleadings pertinent to plaintiffs' claims for relief is that defendant's withdrawal of water "* * * is wasteful and unnecessary in that the fresh water is being pumped into the earth from which it cannot be recovered and there are available to defendant at deeper levels salt water sands sufficient to meet the needs of the defendant."
Counsel for plaintiffs concede defendant's right to drill a well on his property and to withdraw water therefrom, but deny his legal right to withdraw water from an asserted common sub-surface reservoir in such quantities as will drain the sands from which his neighbors obtain water. The issue presented is res nova in this state.
On behalf of plaintiffs it is contended that the provisions of law which directly relate to water rights are set forth in LSA-Civil Code Articles 660-661 and in LSA-R.S. 38:218. It is argued that the application of the codal articles and the statute noted is not limited to surface waters, and, therefore, the use of sub-surface waters is subjected to their provisions. We cannot accept this conclusion, since, in our opinion, the provisions are exclusively applicable to surface waters. We quote the articles and statute as follows:
"Art. 660. Natural drainage
"Art. 660. It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.
"The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water.
"The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome." (Emphasis supplied)
"Art. 661. Use of running water
"Art. 661. He whose estate borders on running water, may use it as it runs, for the purpose of watering his estate, or for other purposes.

"He through whose estate water runs, whether it originates there or passes from lands above, may make use of it, while it runs over his lands; but he cannot stop or give it another direction, and is bound to return it to its ordinary channel, where it leaves his estate." (Emphasis supplied)
LSA-R.S. 38:218. "No person diverting or impeding the course of water from a natural drain shall fail to return the water to its natural course before it leaves his estate without any undue retardation of the flow of water outside of his enclosure thereby injuring an adjacent estate." (Emphasis supplied)
We think the wording of Article 660 is clear and unambiguous and can be construed as referring only to servient obligations with relation to natural drainage and has no reference whatsoever to rights of ownership and use of subterranean waters. This construction was explicitly pronounced in the opinion of the Supreme Court in Elam v. Cortinas, 219 La. 406, 53 So.2d 146, as follows:
"As we construe Article 660 of the Civil Code we take it that it has reference *622 strictly to natural drainage; that is, the drainage which had originally been provided by nature by reason of the respective location or situation of the properties." (Emphasis supplied)
The same interpretation and application must be given to the Statute (R.S. 38:218), which, in words, is restricted to and affects only a natural drain.
Similarly, the application of Article 661 must be limited to surface waters, since it relates to waters which run over the lands.
It is obvious that learned counsel for plaintiffs, recognizing the lack of authority establishing the right of use of subterranean waters, has attempted to supply the deficiency by the following allegation in plaintiffs' supplemental and amended petition:

"14-A.
"Petitioners further show that the exact delineation and physical formation of said body of water from which petitioners have depended on for their fresh water supply and from which defendants (sic) have been withdrawing for said re-cycling processes previously described is not known with precision but is believed to be either in the form of an underground stream which is the equivalent of a surface stream or is a body of sand saturated with water equivalent to a lake or marsh on the surface of the ground. Petitioners further show that the taking of said water by defendant is the equivalent of the damming or draining dry of a stream of water or body of water on the surface." (Emphasis supplied)
We willingly concede, in the absence of specific authority, that the resolution of the question presented must be approached and determined by analogy.
The nature of oil and gas as fugitive substances and as minerals likened to "ferae naturae" is too well established by the jurisprudence of our state to require citation or necessitate comment. Water is a liquid mineral. Underground waters are generally classified either as flowing waters, that is, in the nature of underground streams or rivers, or as percolating waters which seep or move slowly through underground sands or reservoirs without a definite channel or in a course that is uncertain or unknown. 56 Am.Jur., verbo "Waters", Sec. 108, Sec. 111; 93 C.J.S. verbo Waters § 93 b. and c.
Subterranean waters, by analogy, must be classified with oil and gas as fugitive substances. As far back as 1913, the opinion of the Supreme Court in Rives, et al. v. Gulf Refining Company of Louisiana, 133 La. 178, 62 So. 623, quoted from the case of Brown v. Vandergrift, 80 Pa. 142, 147:
"Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals ferae naturae. In common with animals, and unlike other minerals, they have the power and tendency to escape without the volition of the owner. Their `fugitive and wandering existence within the limits of a particular tract is uncertain.' They belong to the owner of the land, and are a part of it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas."
In Higgins Oil & Fuel Company v. Guaranty Oil Company, Ltd., 145 La. 233, 82 So. 206, 5 A.L.R. 411, the opinion of Mr. Justice Provosty made the following comment:
"The analogy between subterranean oil and subterranean or percolating waters is, we believe, near complete * * *."
In common law states one of two general rules is followed with respect to the ownership and use of subterranean waters. The first rule was derived from English Common Law doctrine and permitted the owner of land, as owner of the water beneath such *623 land, to use the water in whatever manner and extent he might desire, subject only to the restriction against avoidable injury to his neighbor; 56 Amer.Jur., verbo "Waters", Section 113; 93 C.J.S. verbo Waters § 93 c. (2).
The second, and perhaps more modern and popular rule, which has come to be known as the "American Rule", is predicated upon the equitable conclusion that the rights of ownership in subterranean waters from the same source are correlative and subject to the restriction of reasonable use; 56 Am.Jur., verbo "Waters," Sec. 114; 93 C.J.S. verbo Waters § 93 c. (3) and (4).
While we might be inclined, through equitable considerations, to adopt the so-called American Rule, we are of the opinion that such action would require a presumptuous and unjustified reversal of the large and uniform body of our jurisprudence with respect to the ownership of fugitive minerals as exemplified by the established determination of ownership of, and rights to, oil and gas. In Roberson, et al. v. Pioneer Gas Company, 173 La. 313, 137 So. 46, 82 A.L.R. 1264, the Supreme Court declared:
"The decisions of the highest court of a state, on the subject of oil and gas leases, or mineral rights, establish rules of property; and they should not be reversed, even though a contrary rule might be deemed more logical, unless it be by an act of the Legisture." (Citing authorities)
The above pronouncement was re-enunciated by the opinion in Bond, et al. v. Mid-States Oil Corp., et al., 219 La. 415, 53 So.2d 149, which approved the above quotation from the Roberson case as being sound and judicious advice.
The non-ownership of the owner of land in fugitive sub-surface minerals in place has been too long and too well established to admit of further question.
The nature of ownership of fugitive substances in Louisiana was conclusively resolved in the famous case of Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207. In the final opinion the court referred to the opinion in Higgins Oil & Fuel Co. v. Guaranty Oil Co., supra, with respect to the analogy between subterranean oil and subterranean or percolating waters (quoted supra) and added a further emphasis to the analogy by likening the right reserved as to oil and gas with the right to draw water from another's land * * * a right of servitude.
Among the numerous opinions in the Frost-Johnson case we refer to the dissenting opinion of Mr. Justice O'Niell on first rehearing in which he quoted from the opinion in the Higgins Oil & Fuel Company case as follows:
"An owner of land does not own the fugitive oil beneath it and cannot complain that it is being drawn off by a pump sunk by an adjoining landowner."
With reference to the Higgins case, it is further worthy of observation that the opinion called attention to the fact that:
"Defendant does not contest the right of plaintiff to get out of its land all the oil it possibly can, and by means of a well, but contests plaintiff's right to do this by means of a pump * * *."
The opinion concluded that there was no difference between a well and a pump, both being artificial and both causing the oil to flow from the neighbor's land.
The issue with which we are concerned in the instant case, as noted early in this opinion, does not involve the right of the defendant to drill a well and use the water therefrom, but seeks to restrict the amount of water which he is entitled to use. Under the law and jurisprudence of this state the regulation of the amount of oil and gas withdrawn from a well was not regulated by our courts, but was only established and controlled by enactment by the Legislature of statutory conservation measures.
*624 Having establishedat least to our own satisfactionthe analogy existing between water on one hand and oil and gas on the other, all characterized as fugitive substances, we cannot find any basis for judicially pronouncing the relief which is sought by plaintiffs. So to do would inevitably involve our courts in a long, unauthorized and complicated series of judicial regulations. We are not unaware of the growing value and importance of water as a natural resource and are cognizant of the fact that, in some instances, it is more valuable and necessary than oil or gas. However, the problem of the regulation and control of water supply and use addresses itself to the legislative branch of government.
We concede the proposition that, even though the right of defendant in the instant case to use an unlimited and unregulated amount of water from a well drilled on his own land cannot be interfered with, plaintiffs would be entitled to damages if caused by intent or negligence on the part of said defendant. The petitions contain no factual allegations which would justify a conclusion that the defendant has intentionally or negligently caused damage to the plaintiffs. On the contrary, plaintiffs' pleadings set forth the purpose and use to which the defendant devoted the water obtained from his well. It is implicit, in view of the water re-cycling project authorized by the Commissioner of Conservation, that defendant directed the water, withdrawn from his well, to a purpose which was useful and beneficial to him. His ownership, acquired upon reducing the water to his possession, is unrestricted and unregulated.
We have not overlooked the argument of plaintiffs' learned counsel with respect to the claims in tort which are predicated upon the specific provisions of Article 667 and the general tort provisions of Article 2315 of the LSA-Civil Code. In this connection, we have given thorough study to McCoy, et al. v. Arkansas Natural Gas Corporation, which was three times considered by our Supreme Court, 175 La. 487, 143 So. 383, 85 A.L.R. 1147; Id., 184 La. 101, 165 So. 632 and Id., 191 La. 332, 185 So. 274; Devoke v. Yazoo & M. V. R. Co., 211 La. 729, 30 So.2d 816; Fontenot v. Magnolia Petroleum Company, et al., 227 La. 866, 80 So.2d 845, and Wright v. Superior Oil Company (La.App. 3rd Cir., 1962, writs denied), 138 So.2d 688. We think the distinction of the case before us lies in the fact that in the cited cases the question of ownership was not involved. We concede that plaintiffs in the instant case might be entitled to relief under certain circumstances; for example, if defendant by his actions caused the pollution of plaintiffs' water supply, rendering it unfit for their use, or if he simply opened his own well and allowed it to pour out the water as waste without benefit to himself. However, we reiterate our conviction that the issue of ownership is the crux of this case. Neither plaintiffs nor defendant own the water percolating into or running through the Wilcox sand which lies beneath their respective properties, but only so much thereof as they withdraw by means of their respective wells. Quite obviously, as between the parties, the amount of water withdrawn, and therefore owned, may be more or less dependent upon the need and use thereof. In the absence of statutory regulation, apportionment or allocation of the amount of water which may be withdrawn from a common reservoir, we conclude that courts are without authority to establish such nature of regulation by judicial pronouncement. It follows that the coincidental damages suffered by plaintiffs must be regarded as damnum absque injuria.
For the reasons assigned the judgment appealed from is affirmed at appellants' cost.
Rehearing denied; AYRES, J., dissents.