CLARKE COUNTY *v.* MISSISSIPPI LUMBER CO.

1. WATERS.  *Underground.  Percolation.  Stream.  Presumption.*

    Subterranean waters are presumed to be percolating, and the law applicable to percolating waters should control a controversy touching them, unless it clearly appear that they are from a distinct underground stream, the existence of which is known or easily ascertainable.

2. SAME.  *Wells.  Injunctions.  Damages.*

    One who, acting in good faith, sinks a well on his own land and, by the use of powerful agencies, forces large quantities of percolating water therefrom for legitimate purposes, is not subject to injunction nor liable in damages to his neighbor in whose well the water is thereby diminished.

FROM the chancery court of Clarke county.

HON. STONE DEVOURS, Chancellor.

Clarke county, the appellant, was the complainant in the court below; the Mississippi Lumber Company, appellee, was defendant there. From a final decree in defendant's favor the complainant appealed to the supreme court. The opinion of the court states the facts.

*J. A. Anderson* and *D. W. Heidleberg,* for appellant.

Special attention is called to the case of *Burroughs* v. *Saterlee,* 56 Am. R., 350. Like the present case, the water flowed from artesian wells through pipes extending above the surface of the ground. Like this, there was no evidence of a subterranean current, except the facts that the water flowed spontaneously above the surface from the wells extending into the ground, and the flowing of water from one well had the effect of speedily stopping the flow from other. There, as in the present case, nothing was known of the size, the direction, and course of the subterranean channel. On page 352 the court

says: "But the defendant insists that when one in good faith sinks a well on his own land, the owner of the well on the adjoining land has no cause of complaint if the water from his well is drawn off or decreased by percolation through the earth. That this is a correct proposition of law seems to be well settled.

Defendant's counsel have cited many authorities in support of this proposition. These authorities, however, as counsel concede, are quite decisive on another proposition, which is that when subterranean water flows in a distinct channel, an adjoining owner of land has no more right to divert its course than if the stream were on the surface of the earth." After citing Gould, Washburn, and Angell on the laws governing surface waters, the court continues: "All of the cases defining underground streams which one proprietor of land may not divert from those of the adjoining owner as those having clearly defined channels, and it must be admitted that this fact is very difficult to establish by evidence. But here we have a case of flowing wells. The evidence shows conclusively that the water does not percolate or filter through the earth from one to each other. When the defendant, in boring its well struck the vein, the water almost immediately ceased to flow from plaintiff's well, and the water that did come to plaintiff's well was filled with sand, which no doubt was caused by the disturbance of the vein or stream by the operations in defendant's well; when the auger used in boring defendant's well was removed, the well of plaintiff ceased to flow; and pending the trial the defendant admitted of record that the vein tapped by Saterlee's well is the same vein which supplies the well first sunk on the property now owned by Burroughs (the well in controversy), and this was nothing but the admission of a fact that was not disputed and could not be controverted on the trial. When the discharge pipe on defendant's well is lower than on plaintiff's well, all of the water flows from the defendant's well; and when the discharge is

made the water finds its way, not by mere filteration, but the effect is immediate. These being the facts, we think the court very properly held that these parties should each use the water from its own well so as not to injure the others. Upon the same principle that the owner of land over which a stream of water has its course may have a reasonable and proper use of the water as it flows, but may not wholly divert it from the adjoining proprietor." It was decreed in the above case that the defendant be required to keep its discharge pipe not lower than the well of plaintiff to enable the plaintiff to get a sufficient supply of water. Considering the fact that the defendant's well in the above case was sunk only two hundred feet from that of the plaintiff. instead of twelve hundred feet, as in the present suit, the cessation of the flow of water from the well of the plaintiff was not more sudden in Saterlee's case than it was from the county's well in the case before the court. During observations extending through months by the county officials the well belonging to the county would stop flowing entirely from one-half to one hour and a half and would not resume its flow in several hours afterwards. That this same result should follow every day during two or three months, and that the other wells of the town should be affected in a less degree in the same way, cannot be accounted for on any other supposition than that they were all fed by a subsurface channel. That water would filter through the earth four hundred yards in one half hour, so as to entirely stop a well of water flowing fifteen or twenty gallons per minute, is inconceivable. That a half dozen or more other wells, one of them six hundred yards distant, should be similarly affected by filtration is still more improbable. Not the least effort was made by the defendant, not a single witness was introduced by it to show that the wells were fed by filtered water. The testimony of the complainant, which is abundant and overwhelming, stands alone and uncontradicted by any fact or circum-

stance.   If, then, the law governing surface streams was made
to apply in *Burroughs* v. *Saterlee,* why should it not apply in
the present suit?   If the fact of a distinctly defined under-
ground current is shown in the former, then why is it not
shown in the latter?   And if the mere natural flow of water
from the defendant's well in *Burroughs* v. *Saterlee* could be
stopped to the extent that it prevented the plaintiff from get-
ting a sufficient supply, then can it be possible that the Mis-
sissippi Lumber Company cannot be prevented from applying
force to draw the water from the county's well?   The court
goes farther in Saterlee's case than this court is asked to go in
favor of Clarke county.   Even if the prayer of the bill is
granted, defendant is to be left in the full enjoyment of all
the water flowing from all of its seven artesian wells, cer-
tainly a very great indulgence.   It is only to be prevented
by the use of great mechanical power from taking water that
does not belong to it, from robbing the plaintiff of what is
justly his, from the use of physical force to divert water which
naturally flows under the plaintiff's land.   The complainant
only asks that it be left to the free enjoyment of its property
without molestation by the defendant; that the defendant be
commanded to use its own property so as not to injure its
neighbor.   It only requests that rights which it already pos-
sessed be not broken up and destroyed, rights which it enjoyed
before the milling plant of the defendant ever had an existence.
It begs that the inmates of the county jail, the inhabitants of
the town of Quitman, as well as the public at large visiting
the county seat, be permitted to enjoy this beneficent gift of Provi-
dence in common with the defendant; that the defendant be
not permitted alone to enjoy it; it asks that the defendant be
not permitted to use methods for furnishing its own pond with
water more expensive than other methods to its own detriment,
and to the great detriment of the complainant.

For quite a full discussion of the law governing percolation

and underground waters, the court is respectfully referred to the case of *Wheatley* v. *Baugh*, 64 Am. Dec., 721, and the elaborate note following the case.

*S. H. Terrall, Jr.,* and *Miller & Baskin* for appellee.

The first proposition we submit is that the bill is predicated of this definite allegation, that "there is a distinctly defined subsurface stream which supplies the well of the appellant," and therefore the sinking of the well by the appellee diverted the water from the subsurface stream, and, hence, interfered unlawfully with the rights of the appellant. If this proposition cannot be maintained by the appellants, we submit that the law is written against appellants. This allegation of a subsurface stream was made on information and belief, and the answer distinctly denies that said wells were so supplied with water. No witness for the appellants testified that there was any subsurface stream. There was no testimony showing any surface indication or other physical indication of any subsurface stream. The water was under the ground, as above mentioned, being from one hundred to two hundred feet and not visible nor discoverable except by making excavations into the ground. We find that one of the maxims of the law is that the appellee owns from the heavens to the center of the earth, "*Cujus est solum est usque ad coelum et ad inferos,*" and that the legal presumption is, where proof to the contrary is not distinctly made, that the water with which the wells of the appellant and the appellee were supplied was water that filtrated or percolated through the earth, and that the appellant, who affirmed that it came otherwise or from a subsurface stream assumed the onus of showing it, the legal presumption being to the contrary. It is said in the case of *Wheelock* v. *Jacobs,* 67 Am. St. R., 670, which case has an elaborate note collecting all the authorities on the subject of the rights of appellant and appellee in this case, that in a majority of cases the exact condition of underground water is not accurately known or

ascertainable, and that in such case a presumption regarding such condition is necessary, and that it is well settled that unless it appears that underground water in a given case flows in a defined and known channel, it will be presumed to be percolating water, citing the following authorities: *Tampa Water Works Co.* v. *Cline* (33 L. R. A., 376), 37 Fla., 586 (53 Am. St. R., 262); *Hanson* v. *McCue,* 42 Cal., 302 (10 Am. R., 299); *Melcalf* v. *Nelson,* 8 S. D. K., 87 (59 Am. R., 746); *Ocean Grove, etc., Assn.* v. *Asbury Park,* 40 N. J. Eq., 447.

The obvious effect of this presumption is to cast the burden of proof upon him who claims rights in subterranean waters upon the ground that they flow in a defined and known channel. *Acton* v. *Blundell,* 12 Mess. & W., 335; *Halderman* v. *Bruckhart,* 84 Am. Dec., 514; 2 Washburn Real Prop. (5th ed.), 374; *Roath* v. *Dirscol,* 20 Conn., 533 (52 Am. Dec., 352); *Brown* v. *Ilius,* 27 Conn., 84.

In the case at bar, the appellee, in total ignorance, or without even a suspicion that there was a subterranean stream or current, erected a large sawmill plant upon its land in the town of Quitman, and found it absolutely necessary to have water to properly conduct its business, and the only means of obtaining the water was by sinking wells and having the water which came from the wells impounded in an artificial pond or lake. This pond or lake was used as a dumping spot, as it were, for its logs, from which pond it could, by machinery, convey the logs to the saw and there saw them into lumber and sell said lumber, and in this way follow a legitimate calling. To show the good faith of appellee, it invested the sum of $150,000 in its lands, buildings, machinery, etc. It therefore had absolute dominion of all above its lands as far as the heavens in one direction, and to the center of the earth in another direction. It did not undertake to interfere with the appellant or any one else as to any subsurface stream, nor appellant or any one else's rights in any visible or discernible subterranean stream. There is no pretence in the bill that the ap-

pellee maliciously or negligently undertook to divert water in an even unknown subterranean stream to the damage of appellant or any one else. It acted on the absolute dominion or proprietorship over its own lands, as above mentioned, to the center of the earth; and also on the legal right that the iron ore, or the water, or rocks underneath the earth belonged exclusively to it, and that, therefore, it was not responsible for destroying a spring or well of an adjoining owner, because said adjoining owner's rights were limited alone to surface streams or to known and well-defined subterranean streams, and where neither of these conditions existed, then there could be no injury to the appellant or any other inferior proprietor. *Gould v. Eaton,* 44 Pac. R., 319; *Williams v. Ladew* (Penn.), 9 Atl. R., 54; *Whittel v. Baugh,* 25 Pa. St., 528; *Chase v. Silverstone,* 62 Me., 175; 16 Am. R., 419; *Bloomqood v. Ayres,* 108 N. Y., 406; Lybe's Appeal, 51 Am. R., 542; *Williams v. Ladew,* 41 Am. St. Rep., 891.

We now invite the court's attention to the very elaborate and well argued case found in 33 L. R. A., 376, which declares that the presumption is in the absence of proof, that waters that are under the earth are caused from filtration and percolation, rather than underground currents or streams. *Taylor v. Welsh,* 6 Or., 199; *Collins v. Chartiers Valley Gas Co.,* 131 Pa. St., 143 (17 Am. St. Rep., 791); Lybe's Appeal, 106 Pa. St., 626; *Wheelock v. Jacobs,* 67 Am. St. R., 663.

Argued orally by *W. D. Heidelberg,* for appellant, and by *W. E. Baskin,* for appellee.

CALHOON, J., delivered the opinion of the court.

The bill in chancery of the county charges that it had an artesian well in its courthouse inclosure, which furnished an abundant supply of water for its purposes, and that there were fourteen other such wells, of private ownership, in the county town, of great value to the persons owning them; that appellee,

at a point about four hundred yards from the county well, bored four such wells on its own land, and put into one of them a pipe into which was forced compressed air of such power of suction as to far exceed the natural flow of water into that well, and so greatly diminished the supplies of the county and private wells in the town. It is alleged that the purpose of appellee in the use of this compressed air suction was to supply a pond for logs for its saw-mill and planer. Such ponds seem necessary for the preservation of logs and to conduct them to the mill to be manufactured into lumber. It is charged that appellee could have supplied itself with enough water by piping it three-quarters of a mile from the Chickasahay river, and that it could have located its mill elsewhere with convenient water in any quantities without the use of an artesian well. The bill then proceeds: "Complainant further states, upon information and belief, that the artesian well belonging to the county of Clarke, and those belonging to the citizens of the town of Quitman, including those owned by the defendant near its mill, are supplied with water from a 'distinctly defined underground current or stream.'" The result of the use of the compressor is charged to be that "the flow of water from said underground current is diverted" from the county and private wells, and the county well is thereby exhausted and dried up; and an injunction was obtained, which was afterwards dissolved, and, upon proof taken, the bill was finally dismissed by the court below. The answer points out the irrelevancy of the allegations about the wells of private persons; states that appellee expended $150,000 on its plant, that the wells it bored were upon its own land and necessary for its mill, that there was no visible or known underground channel or stream, and that the pond was a necessity in its business; repudiates the idea of any duty on appellee to have erected its plant elsewhere, or to bring water through pipes from the river, but denies the equal convenience of another location or of piping from the river, denies that the well sup-

ply is from a defined underground current or stream, and avers that, if the county would lower its standpipe two feet, the trouble would be corrected. On testimony taken on both sides, the chancellor dismissed the bill.

It is to be noted that in the bill there is a charge that the water supplying all the wells was from a "distinctly defined underground current or stream," and that this is denied in the answer, and that the proof does not sustain the charge. It is plain from this record that no man or corporation boring a well on his own land had any reason to suppose that the use of it could affect the wells of others. Clearly, there was no surface indication of an underground stream. The well of the county was not "dried up," but the supply was diminished. It must further be noted that there is no pretence in the bill, or squint in the proof, that appellee ascertained or designed, expected or contemplated, that any such result would follow. The good faith of appellee is quite apparent, as is the fact that it foresaw no damage to others. The boring of a multitude of private wells might easily have caused the same result, and it will not be contended that private landowners could not bore at will for water for any purpose for their own use. It is shown that the numerous artesian wells in the town were widely separated over a large scope of territory, striking water at various depths, from one hundred to two hundred feet, and this is inconsistent with the inference of a defined channel, and conclusive that the water was from percolation, or a multitude of independent wandering rivulets, which the authorities put under the same rule with percolation. It might suffice to dispose of this case to note that the only issue tendered is the charge in the bill, "on information and belief," that the wells were all "supplied with water from a distinctly defined underground current or stream." This charge was denied, and the proof utterly fails to sustain the allegation of the bill. But without so disposing of this record we will look a little into the principles applied to subsurface waters. There is a

marked distinction in the rights of landowners to the use of surface and underground waters. The waters below are presumed to be wandering, percolating waters until a defined, continuous channel is shown; and even then, in order to apply to them the rules settled in reference to surface streams, it must be further shown, not only that the stream has a distinct, defined, underground channel, but this must be known or notorious. Otherwise, as to them, it seems that the excavator in good faith and for his own purposes, will be judged by the law applicable to unknown wandering rivulets or percolating waters. In order to prevent the classification of underground streams with percolating waters they must be known or easily ascertainable, and discoverable from the surface of the ground without subsurface explorations. This occurs where the stream sinks under and rises to the surface. The important fact is that of knowledge had, or "easily acquirable, of their existence, location, and course." "It is well understood that underground streams with well-defined channels will be treated as percolating waters if their existence and location are unknown and not reasonably ascertainable." The authorities for all the foregoing may be found in the elaborate note to *Wheelock* v. *Jacobs* (Vt.), 43 L. R. A., 105 (67 Am. St. Rep., 659, s.c., 40 Atl., 41), and *Waterworks Co.* v. *Cline* (Fla.), 20 So., 780 (33 L. R. A., 376; 53 Am. St. Rep., 262). Now, based on the maxim, *"Cujus est solum ejus est usque ad coelum,"* it seems to be quite universally held that such waters belong to the realty, to be used at will by its owner for any purpose of his own, whether it be for machinery, mining, milling, or "a reservoir on his own land." *Wheatley* v. *Baugh,* and notes, 64 Am. Dec., 721; *Acton* v. *Blundell,* 12 Mees. & W., 335; *Haldeman* v. *Bruckhart,* 84 Am. Dec., 511; *Ocean Grove* v. *Asbury Park,* 40 N. J., Eq., 447 (3 Atl., 168). A vast number of cases might be cited, but with the foregoing as pointers, and Gould on Waters, tit. "Subterranean Waters," it will be seen that the principle is nearly universal. There are two or three cases which seem to

be exceptions, but which themselves recognize the rule and differentiate the concrete cases from it. The best type of these is *Forbell* v. *City of New York,* 164 N. Y., 522 (58 N. E., 644; 51 L. R. A., 695; 79 Am. St. Rep., 666). But it is plain in this case, and the others, that they are expressly differentiated from the whole current of authorities, and excepted from it, because there the very purpose of the well, and the suction resorted to, was not to obtain water for use on the land, but to steal the percolating water from truck farms over an area of many miles square, in order to make merchandise of the water itself, by conducting it through conduits for sale to great city. The right to bore for water to be used on the land for the business uses of the owner of the land is fully recognized. This right is nowhere denied. In the case at bar there is no pretense of bad faith, and none that the operations of appellee in any way affect the agriculture of the neighborhood, or that it is disturbed in any degree. A like performance by a private citizen for his mine or well or cotton gin would hardly be questioned. It is *damnum absque injuria.* The mere boring of a single well might destroy the well of a neighbor on a lower level, but this would furnish no cause of action. Lybe's Appeal, 51 Am. Rep., 542. As to the facts in evidence we do not, in this opinion, go into them in detail, but we approve the decision of the chancellor on the whole case.

*Affirmed.*