(82 South. 206)

No. 21837.

HIGGINS OIL & FUEL CO. v. GUARANTY OIL CO., Limited.

(May 5, 1919. Rehearing Denied June 2, 1919.)

*(Syllabus by Editorial Staff.)*

1. ADJOINING LANDOWNERS &#8258;8—USE OF PROPERTY.

An owner cannot be debarred from the legitimate use of his property simply because it may cause a real damage to his neighbor.

2. MINES AND MINERALS &#8258;47—PERCOLATING OILS—USE OF PUMPS.

There is no difference between a well and a pump used in taking oil from subterranean regions, as far as adjoining landowners are concerned; both being artificial and both causing oil to flow from the neighbor's land by creating a vacuum which the oil from the neighbor's land comes in to fill.

3. MINES AND MINERALS &#8258;47—FUGITIVE OIL—OWNERSHIP.

An owner of land does not own the fugitive oil beneath it, and cannot complain that it is being drawn off by a pump sunk by an adjoining landowner.

4. ADJOINING LANDOWNERS &#8258;1—USE OF PROPERTY.

An owner of land is not bound to do anything to save his neighbor from loss; the only restriction upon him being that he abstain from doing anything that might cause a loss.

5. MINES AND MINERALS &#8258;121—ABANDONED OIL WELL—INTERFERENCE WITH LIVE WELL.

Where an owner of land sunk an oil well which was a nonproducer, but which let air into the subterranean regions, preventing an adjoining landowner from drawing oil with a pump he had sunk, he will be enjoined from leaving the well open, to the adjoining landowner's damage, the dry well not benefiting him, under Civ. Code, arts. 491, 505, 666–668, 2315.

6. MINES AND MINERALS &#8258;47—FUGITIVE OILS.

A landowner may prevent fugitive oil from being drawn from under the surface of his own land, if he can do so by some mechanical means which does not interfere with the rights of adjoining landowners to draw off the oil under their respective lands.

Monroe, C. J., dissenting.

Appeal from First Judicial District Court, Parish of Caddo; T. F. Bell, Judge.

Suit by the Higgins Oil & Fuel Company against the Guaranty Oil Company, limited. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

N. C. Blanchard and Blanchard, Goldstein & Walker, all of Shreveport, for appellant.

Wilkinson & Lewis, of Shreveport, for appellee.

PROVOSTY, J. The plaintiff holds an oil lease of a tract of land adjoining another tract of which the defendant holds a lease of the same kind. The plaintiff sunk a well on its tract, and was drawing oil from it by means of a pump at the rate of some 124 barrels a day, when defendant sunk a well on its tract approximately 400 feet from plaintiff's well. This well of defendant proved a nonproducer, and was abandoned. Through some underground communication it lets air into the radius affected by plaintiff's pump, thereby reducing the suction power of the pump, and as a consequence reducing markedly its production. By closing this dry well, which may be done with no trouble or expense by simply putting back the plug that has been taken out, the capacity of plaintiff's pump is at once restored. Defendant refuses to close it; and plaintiff brings this suit to compel defend-

ant to do so, and also to recover the damages suffered up to now, and continuingly being suffered, as the result of the reduced production of the pump. The petition of plaintiff alleges these facts, and that, while plaintiff's pump is thus being prevented from working to its full capacity, the pumps which are being used by other parties on all the adjoining tracts of land are depleting the reservoir of oil which lies under the lands of that locality. And the petitioner further alleges as follows:

"That by permitting the said abandoned well to remain open does not in any way profit or aid the said Guaranty Oil Company, its lessee, the Nash Oil & Gas Company, in getting production from the producing well, Guaranty No. 2, and that the only effect of having the said well open is to injure petitioner without bringing about any advantage whatever to the said Guaranty Oil Company or the Nash Oil & Gas Company."

Plaintiff does not allege that the underlying oil cannot be brought to the surface otherwise than by pumping, but that allegation is impliedly contained in the allegation which is made that every operator in that oil field is using a pump.

An exception of no cause of action was sustained below, and plaintiff has appealed.

The articles of our Code bearing upon the matter are the following:

"Art. 491. Perfect ownership gives the right to use, to enjoy and to dispose of one's property in the most unlimited manner, provided it is not used in any way prohibited by laws or ordinances."

"Art. 505. The ownership of the soil carries with it the ownership of all that is directly above and under it.

"The owner may make upon it all the plantations, and erect all the buildings which he thinks proper, under the exceptions established in the title: Of Servitudes.

"He may construct below the soil all manner of works, digging as deep as he deems convenient, and draw from them all the benefits which may accrue, under the modifications as may result from the laws and regulations concerning mines and the laws and regulations of the police."

"Art. 666. The law imposes upon the proprietors various obligations towards one another, independent of all agreements; and those are the obligations which are prescribed in the following articles.

"Art. 667. Although a proprietor may do with his estate whatever he please, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.

"Art. 668. Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor."

"Art. 2315. Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it."

This last article can be but of little assistance in the case, for it applies only to a person who is at fault, or, in other words, who has committed, or is committing, a wrong; and the question in the case is whether the defendant is "at fault."

The provision of article 667, that the owner may not make any work on his property "which may be the cause of any damage to" his neighbor is found under the title "Of Servitudes," and hence apparently is one of the exceptions to which article 505 refers, and hence would seem to be a limitation upon article 505.

[1] It is also apparently in direct conflict with the provision of article 491 that "ownership gives the right to enjoy and dispose of one's property in the most unlimited manner." The line of demarkation between what an owner may do with impunity and what he may not do without incurring liability is drawn by article 668 between what is a mere inconvenience and what causes a real damage. But that cannot be the meaning; for very evidently an owner cannot be debarred from the legitimate use of his property simply because it may cause a real damage to his neighbor. It would be contrary to the fundamental legal principle according to

which the exercise of a right cannot constitute a fault or wrong, and, besides, every damage is real; an unreal damage cannot be a damage.

We cannot reconcile these contradictions, or gather the true meaning or scope of these articles, from the articles themselves, but, for ascertaining this true meaning, must resort to the works of Pothier and Toullier, whence these articles were derived by the framers of our Code.

Pothier, in his second appendix to his work on Partnership (Paris Ed. 1835) vol. 3, says:

At page 549:

"Neighborhood is a quasi contract which creates reciprocal obligations between the neighbors; that is to say, between the owners or possessors of contiguous estates."

And at page 556:

"The laws of good neighborhood forbid me to cause anything to pass from my estate to that of my neighbor which may damage him; but they do not prevent me from depriving him of some convenience which he derives from my estate. For instance, if he derives light from my estate, I may, by raising a building on my estate, deprive him of this light."

And in his general introduction to his treatise on Customs, volume 10 of same edition. he says:

At page 40:

"Ownership may be defined to be the right to dispose of a thing as one pleases, provided the rights of others are not thereby infringed, or some law violated."

At page 41:

"The rights here alluded to as not to be infringed upon are not only those which others may at some future time be entitled to have in the estate, but also those of the owners or possessors of neighboring estates. Although ownership gives to the owner the power to dispose of his estate as he pleases, he nevertheless cannot do what the obligations of neighborhood do not allow him to do to the prejudice of his neighbors."

And in his treatise on Ownership, volume 8 of same edition, he says at page 117, No. 13:

"We have defined ownership to be the right to dispose at one's pleasure of a thing; and we have added, without, however, infringing the rights of others. * * * Among these rights are those of owners and possessors of neighboring estates. The owner of an estate, howsoever perfect his ownership may be, cannot injure these rights, and, in consequence, cannot do that within his estate which the obligations arising from neighborhood do not allow him to do therein to the prejudice of his neighbors."

Toullier, des Biens, Vol. 3, p. 207, No. 327, says:

"Independently of these special cases the law forbids, in general terms, all such use of one's property as may cause a real damage to the public or to individuals; and by damage we are to understand whatever loss or diminution we suffer in our property by the fault or the act of another.

"328. But the damage must be real. A simple inconvenience, or even the prejudice which might be caused to the neighbor by legitimate acts of ownership such as I have the right to exercise on my property, would not be a sufficient motive to cramp my liberty in the exercise of these rights, and to furnish ground of complaint to the neighbor, provided these acts are not dictated by a desire to injure the neighbor, without any usefulness to myself.

"Now, the desire to injure is not to be presumed in the person who does but use a right he has.

"For example, if in digging a well for my own utility I cut off the spring which was feeding the well of my neighbor, he has no right to complain."

The commentary of Toullier in elucidation of these principles is not near so satisfactory as that of Pothier, and especially as those of the commentators of the Code Napoléon. We will, therefore, for brevity's sake, omit that of Toullier, and give those of some of these commentators. As there is no difference between them, with one exception, Demolombe, we will confine ourselves to Laurent and Baudry-Lacantinerie and Chauveau, who are the most satisfactory. The Code Napoléon

not containing a provision corresponding with the said proviso of article 668, Demolombe, basing himself upon the definition of ownership as giving the right to use, enjoy, and dispose of one's property in the most unlimited manner, and upon the principle that one who but exercises a right he has cannot be at fault, concludes that, even though what is done is simply for the purpose of injuring the neighbor, with no benefit to the owner, the neighbor has no right to complain; but the author adds that the contrary doctrine "which is very ancient," is generally admitted. Des Servitudes, Nos. 66 and 648.

Laurent, De La Propriété, vol. 6, p. 186, No. 138, says:

"The science of jurisprudence requires as much precision as the imperfection of language will allow of. The laying down of principles so vague as to open the door to conclusions evidently false ought to be avoided. In our present discussion, the word 'damage' ought to be discarded, and the expression 'infringement of right' adhered to: no doubt, a damage results from such infringement of right, but the sole fact of there being a damage does not suffice for giving rise to an action. And this is, at bottom, the doctrine which has been consecrated by the decisions of the courts."

And again at page 183, No. 136:

"We come to another formulation of the principle, precisely as Pothier formulates it: The right of the owner is limited only in so far as it comes in conflict with some equal right of another owner. Hence, in order that he should have to repair a damage caused by him in the exercise of his right, it does not suffice that he should have caused the damage, but some right of the neighbor must have been thereby infringed. If he does not infringe some right of the neighbor, though he cause a damage, he is not held to any reparation."

No. 140:

"It is then a settled principle that a person who uses his own right without infringing the right of another owes no reparation for the damage he may cause. But the application of that principle gives rise to more than one difficulty. If the owner who uses his right does it through malice, from a desire to injure, without any profit to himself, will he be held bound to repair the damage he causes, although he does not infringe any right? There is an ancient maxim inscribed in the Roman laws which says that we must not favor the perversity of men. Now, would it not be to encourage this perversity if a right were allowed to be used for the sole purpose of injuring another. Perhaps another maxim, equally inscribed in the Roman laws, will be invoked, according to which what one does in the exercise of one's own right cannot injure one, in this sense that the person acting is not held to repair the injury. But can it well be said that to exercise one's right for the sole purpose of causing injury is the exercise of one's right? Why are rights sanctioned by law? Because they are faculties which are necessary to enable us to fulfill our mission on this earth. Is it our mission, forsooth, to do evil for the mere pleasure of doing evil? And does the legislator owe protection to him who employs for doing evil a right which has been accorded to him as an instrument for intellectual and moral development? Conscience answers with the Roman jurisconsults: 'Malitiis hominum non est indulgendum.'

"And that has been the view taken by the courts. An owner constructs a building which cuts off his neighbor's light. In so doing he but exercises a right he has, and therefore owes no reparation of the damage he causes to the neighbor. But he does more; he erects in front and almost against the window of his neighbor, part of which is already masqued by the new building, a dummy chimney, beginning on the roof, resting on the rafters, at the extreme corner of the gable end of the building, and which cuts off all the light from the window. The court of Colmar ordered the suppression of the dummy chimney. It acknowledges that the owner can, in strictness, abuse of his property, but on one condition, that he does not do it for the purpose of injury. Rights are serious things and must be used seriously. Beyond that serious use there is no right but only wickedness, and justice cannot sanction an act prompted by malevolence.

"An owner constructing works on his land diminishes the volume of a spring the benefit of which his neighbor has been having. He is within his right. If he thereby causes an injury to his neighbor, the latter cannot complain; for he has not the absolute ownership of the waters. But, if it has been by malice that the works have been undertaken, for the sole purpose of injuring the neighbor, we have no longer the exercise of a right, but spitefulness, and he who abuses malignantly of his right

ought to repair the damage he causes. This was the decision of the court of Lyons in the following case: A mineral spring spreads over several tracts. One of the owners sets up a pump for getting a larger quantity of the water, not for using it, but for pouring it, in pure waste, and, we will add, through spite, into a river. The court condemned him in damages, but without ordering the suppression of the pump. We think that in the latter connection the court was too conservative. From the moment that an act can be characterized as illicit the owner can no longer invoke any right of ownership; now an unlawful act should disappear."

The treatment of the same matter by Baudry-Lacantinerie and Chauveau, des Biens, p. 159, No. 215 et seq., is as follows:

"Ownership is subject not alone to the restrictions imposed by law and by the regulations of police. Notwithstanding its absolute character, it has to be circumscribed within rational limits which secure the legitimate faculties inherent in this right. It is, in truth, no longer a matter of actual infringement upon the right of ownership; it is no longer a sacrifice demanded of it; the limits are established rather in its own interest; they have for their object to render more precise its normal operation, its natural exercise, to secure respect for it against the possible acts of other owners— in a word, to regulate the conflicts of a private nature, or of civil right, which are likely to arise between neighboring owners in their relations with each other. The general object of civil law is to assign to the exercise of the natural liberty of each individual the restrictions which are necessary to make it compatible with that of others. This principle applies as well to the exercise of the right of ownership as to that of any other right. The respect which I exact for my property obliges me to respect that of others, so true it is that every right has for its correlative an obligation; and so the right to use one's property at pleasure finds itself necessarily limited by the obligation to leave to the neighbor the faculty of also enjoying his property. Portalis has put that idea in a very clear light in his exposition of motives: 'The right of the owner,' said he, 'however extensive it may be, suffers certain limitations which the state of society renders indispensable. Living with our equals, we have to respect their rights, as they have to respect ours. We must not allow ourselves, even on our own property, to do anything which may in-jure the acquired rights of a neighbor or of any one else.' Pothier, on his part, had already been careful to note the same idea in his definition of ownership: 'The right to dispose of a thing as one pleases, provided the rights of others are not thereby injured, or some law violated.'

"If article 544 [of the Code Napoléon] has not reproduced this same reservation [the Louisiana Code has reproduced it; vide article 667], we must not conclude therefrom that the framers have repudiated the soundness of that notion; the exposition of motives would of itself have sufficed to show the contrary even if the Code had not made elsewhere formal applications of that idea, under the title Of Servitudes, as, for example, in articles 671, 674, 675, and 684. Moreover, this indispensable limitation upon the right of ownership results from general legal principles; for the obligation which rests upon every owner to respect the rights of others and to repair any unjust damage he may have caused, even by the exercise of the attributes attached to his right of ownership, finds a sufficient sanction in the sweeping terms of article 1382 of the Code. [Our article 2315. "Every act of man which causes damage," etc.]

"216. The simple fact of neighborhood, then, imposes certain limitations upon the exercise of the faculties inherent in ownership; and this is the reciprocal interest of the owners. This feature of reciprocity shows the correctness of the observations made hereinabove, and proves that the sole purpose is to cause ownership to be restricted, and to regulate the conflict of rights between the neighboring proprietors. The Code has made express provisions for some of these limitations, those most usual, most indispensable, those which are of general and constant application; thus the provisions found under the title 'Of Servitudes' concerning the precautions which must be taken for the drainage of waters (article 681), the regulation of lights and views (articles 675–681), the distance to be left between plants (articles 671– 674), the distance and the intervening works required for certain constructions (article 674), rest upon the necessity of reciprocal limitations being imposed upon adjoining proprietors.

"217. But there are other applications of the same idea which the Code has not noted, and which it is well to call attention to here as corollaries of the general formula within which the obligation inherent to neighborhood finds itself circumscribed. The wording of this formula seems, it is true, to be a rather difficult matter, and one can hardly flatter oneself to

be able to attain any very great precision. Here is, however, a proposition which appears acceptable: That every owner is limited in the exercise of his right of ownership by the inhibition to injure the equal right of the neighboring owner. This formula implies, in the first place, that simply to deprive the neighbor of some enjoyment, or to cause him a prejudice of whatever kind, would not be sufficient to fetter the exercise of the right of ownership. The question of determining the point where an act begins or ceases to be injurious to the right of the neighbor is, no doubt, a very delicate one; it will be of absolute necessity to have recourse to an analysis, minute in its details, of the faculties, of the attributes, of the advantages which compose the right of ownership, to know if one of them is infringed upon, and thus to diagnose the injury to the neighbor's right. * * *

"220. We must guard, however, against a too hasty application of this formula. In one sense it implies a restriction, and in another sense it implies a certain extension. It is restrictive in the sense that the injury must be of a certain gravity; in other words, the neighbor cannot complain of those inconveniences which are habitual and inevitable, the trifling annoyances inseparable from neighborhood; the necessities of life in common imposes certain usages susceptible of causing annoyance, but each one must bear these reciprocal inconveniences; so long as they do not transcend the normal and habitual measure of inconveniences resulting from neighborhood, no action in damages will lie. The courts must consider whether the prejudice complained of is excessive, greater than the ordinary inconveniences which the obligations of life create; they may take into consideration in that connection certain circumstances, varying according to locality, and take into account the local habits. * * *

"222. On the contrary, in the extensive sense of the formula, an action in damages lies even though the owner be within the limits of his rights if he acts through malice, for the sole purpose of causing an injury to another, or even if, acting without any evil intention, he acts with great imprudence, and thereby causes injury to his neighbor. In such a case, indeed, the question is no longer as to whether the owner has overstepped the limits of his rights, but, all question of ownership being put aside, to restrain an illicit act, to repair an offense or quasi offense of a civil nature inherent in every malicious or damageable act. Thus, an owner could not raise opposite the window of his neighbor a dummy chimney for no other purpose than to obstruct the opening and to deprive the neighbor of the little light which was left him by the new construction. In like manner an owner could not wickedly cut the source of a spring which comes out on his neighbor's property, not for the purpose of himself using the waters of the spring, but to pour them out in pure waste into a river. However, the mere inaction of an owner could not serve as a basis for a demand in indemnification, although the prejudice should result from this inaction. Thus an easy-going neighbor neglects to defend his property against the action of waters. The land is carried away little by little, and this brings on the collapse of the neighboring houses. This fact does not make the owner responsible, and he cannot be compelled to do anything to prevent the ruin of the houses.

"When a neighbor has legitimate grounds of complaint against the acts of another owner, what is the result of the suit he brings? There can be no doubt that the courts can allow damages to the extent of the prejudice that has been caused. The indemnity must first make good the damage suffered in the past, and not alone that suffered since the putting in default. Article 1146 [1926 La. Code] has no application to matters of offenses and quasi offenses. The courts can, moreover, award damages in reparation of the prejudice which will occur in the future, if things remain in the same condition. So long as the injurious fact subsists, the prejudice continues to be certain, and the courts may take into consideration the future consequences of this known fact in order to save the parties from the too frequent renewal of the same suit: the judgment, it is true, in so far as relating to the future, will have a conditional character. The condemnation will be subordinated to the continuance of the actual prejudice, which will allow the parties to ask at any time its modification, accordingly as the prejudice may increase or diminish, or cease altogether. * * *

"224. The courts have another way of solving the problems arising from the apprehension of future prejudice; they have at their disposition, in that regard, another sanction, for they may order a modification of the prejudicial condition of things and order the doing of whatever may be necessary to be done to put an end to the abusive exercise of the right of ownership."

On the point of an owner not being allowed through pure spite or wantonness to do something on his property injurious to his neighbor, we find but one dissenting voice among

the French law-writers and decisions. It is Demolombe, who, in his work on Servitudes (volume 12 of the Paris Ed. of 1859, at pages 139 and 140), says:

"No. 647. * * * Digging a well on one's own property, although it may cause the neighbor's well to go dry, is none the less a permitted act; this result is a purely fortuitous event; strictly speaking, it is less an actual damage the neighbor suffers as that he ceases to enjoy an accidental, casual, provisional profit, on which he had no right to depend.

"And this principle is now generally recognized.

"No. 648. We must add, however, that generally a very important qualification is applied to that principle, which it is contended would be no longer applicable if the owner, in constructing on his land some work the effect of which is to deprive the neighbor of an advantage he has been enjoying, did so for no other purpose than to injure this neighbor with no benefit to himself.

"This modification, indeed, appears to be as ancient as the principle itself, and we invariably find it coupled with the principle in the works of the Roman jurisconsults (L. 1, paragraph 12, f. f. de aqua), and of our ancient authors [citing long list], and in the decisions of the courts [citing decisions].

"This modification, despite its traditional ancientness, appears to us to be inadmissible.

"The text of article 644 is formal; it is in the most absolute manner that an owner may use or enjoy his property.

"Legally no account can be required of him of his motives; there is here a bar which precludes the making of any allegation that he has acted from malice."

From Carpentier and Du Saint:

"If it is found that an owner who has dug his soil has been prompted in doing so simply by the desire to injure his neighbor, the court can abate what has been done." Carpentier and Du Saint, Rep. du Droit Francais, vo. Eaux, p. 435, No. 145, citing numerous authorities.

From these excerpts it is clear that cases like the present are not to be decided by the application of any broad or inflexible rule, but by a careful weighing of all the circumstances attending them, by diagnosing them, to use the expression of Baudry-Lacantin-erie and Chauveau, with the aid and guidance of the two principles, that the owner must not injure seriously any right of his neighbor, and, even in the absence of any right on the part of the neighbor, must not in an unneighborly spirit do that which while of no benefit to himself causes damage to the neighbor.

Defendant does not contest the right of plaintiff to get out of its land all the oil it possibly can, and by means of a well, but contests plaintiff's right to do this by means of a pump, because a pump sucks the oil from under defendant's land. The argument is that plaintiff may appropriate the oil passing from defendant's land to plaintiff's, provided the oil passes, or flows, from the one tract to the other "naturally," that is, by gravity, and not as the effect of the use of artificial means.

[2, 3] So far as artificiality is concerned, we do not see the difference between a well and a pump; both are artificial; both cause the oil to flow from the neighbor's land; and both produce that effect by creating a vacuum which the oil from the neighbor's land comes in to fill. In both cases the oil flows from the neighbor's land by gravity. The fact that some of the oil which plaintiff's pump is producing may come from defendant's land can make no difference; for in the case of a flowing well so close to the boundary line that one-half of its product would to a reasonable certainty be known to be coming from the adjoining tract the owner of this tract would hardly, we imagine, claim either the ownership of one-half of the oil or the right to close the well; and the reason would be that an owner of land does not own the fugitive oil beneath it so as to have the right to follow it after it has left his land.

The analogy between the subterranean oil and subterranean or percolating waters is, we believe, near complete, and defendant cites the case of Forbell v. City of N. Y., 164 N. Y.

522, 58 N. E. 644, 51 L. R. A. 695, 79 Am. St. Rep. 666, where the operation of a pump was enjoined because it had the effect of drying up the surface of the land to the great damage of the neighbor. That decision would be in point if the surface of defendant's land was being injured by plaintiff's pump. True, the court reasoned the case somewhat differently; but that was the true ground of the decision, for the court admitted that, so far as the water was concerned, the complainant had no ownership of it, and, of course, if so, the taking of it, whether by means of a pump or otherwise, invaded no right of the complainant, and therefore furnished no ground of action. But invasion of the surface did, because the complainant had the right to use and enjoy the surface uninterfered with by the pump of the defendant city. In a pumping case where no surface right of the neighbor was being interfered with, but only the percolating water was being taken, the Supreme Court of Mississippi denied an injunction, although the complainant's supply of water was being thereby reduced. Board of Supervisors of Clarke County v. Miss. Lumber Co., 80 Miss. 535, 31 South. 905. In the civil law the right to drain off by means of a deeper well the subterranean water of the neighbor is well settled, and apparently in the common law too. 20 A. & E. E. of L. 314. Judge Thornton, in his work on Oil and Gas (2d Ed.) p. 49, says that, if pumps could not be used, oil territory would be practically useless, and few wells would ever be drilled. And, of course, what is meant by this is that the neighbor cannot complain even though possibly or probably the oil under his land is being drained off by the pump.

All the operators in the oil field in question, including defendant, are using pumps; what good ground, then, could defendant have for denying plaintiff the right to do that same thing?

Plaintiff's right to operate this pump would appear, therefore, to be clear, and that defendant's well, or air pipe is seriously interfering with the operation of the pump is one of the facts alleged in the petition which for present purposes must be taken for true.

Were defendant leaving this well open for some purpose of utility other than the supposed utility of preventing the drainage of the oil from under defendant's land, a different case might perhaps be presented; but the allegation, which must be taken for true, is that leaving this well open is of no benefit to defendant. It will be noted that this action of defendant in leaving this well open has the effect not merely of preventing plaintiff from drawing the oil under defendant's land, but also from under plaintiff's own land; so that an unquestioned right of plaintiff is being interfered with.

[4] Were this result brought about by the mere inaction of defendant, plaintiff could not complain. An owner is not bound to do anything to save his neighbor from loss. The only restriction upon him is that he abstain from doing anything that may cause a loss. In the present case defendant is not charged with mere inaction, but with the action of having bored this well and thereby opened a vent for the air to penetrate where it causes injury. Had defendant left things in their original condition, plaintiff would not be suffering. Defendant is causing this air to pass from its land to that of plaintiff. True, defendant is now merely passive or inactive; but the agency complained of was set in motion by defendant. Defendant alone is responsible for its beginning and its continuing: its activity is therefore that of defendant.

[5] An owner has the perfect right to put down an oil well; but, when the well proves to be injurious to the neighbor, this brings about a complication—a complication which can be solved only by a consideration of all the attending circumstances. A strikingly illustrative case is Ohio Oil Co. v. State of In-

diana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729, where because an oil and gas basin is the common property of the owners of the several tracts of land above it the owner of one of the tracts was restrained from wasting the gas, even though his doing so was for the to him useful purpose of lifting the oil to the surface. In that case the owner, in tapping the stratum of oil and gas, and using the gas for bringing up the oil, was but exercising a right clearly and admittedly incident to his ownership, and yet he was restrained because his act was injurious to the other owners in the same oil and gas field. The rights of the several owners of the gas field are coequal; one owner cannot exercise his own right so as to preclude his neighbor from exercising his, or so as to interfere with the neighbor.

The allegation is that the air is being let into a fissure or conduit through which it passes out of defendant's land into that of plaintiff and unto the radius affected by plaintiff's pump. Now if, knowing of this fissure, and knowing that any air let into it would go to plaintiff's land and paralyze plaintiff's pump, the defendant had sunk the dry well in question for the very purpose of its having that effect, would it not be plain that the defendant was not merely exercising its own right, but deliberately injuring the right of plaintiff. And what difference is there between sinking this dry well intentionally for that purpose and letting it remain open intentionally for that purpose.

In last analysis the case must turn upon whether plaintiff has the right to operate the pump in question, and whether, if plaintiff has that right, defendant may interfere with it with no benefit to itself, but simply to hinder plaintiff.

[6] In the case supposed above of a well so near the boundary line as to be deriving one-half of its product from the adjoining land, we do not suppose there would be any dispute as to the right of the adjoining owner to interpose a partition between the two tracts of land so as to prevent the escape of oil from his land. Unquestionably he could build a wall for preventing the wild animals on his land from escaping; and oil comes much nearer forming part of the realty than the wild animals do. And if an owner may thus protect himself by means of a partition or wall, why not by any other kind of work on his land. So that, if defendant's action were limited to preventing the oil from escaping to plaintiff's land, we should be clear that plaintiff would have no good ground for complaining. But for all that is known, no oil is being drawn out of defendant's land, while to a certainty defendant is directly and seriously interfering with plaintiff's right to operate for oil and is doing so with no benefit to itself.

The judgment appealed from is therefore set aside, the exception of no cause of action is overruled, and the case is remanded for trial.

MONROE, C. J., dissents.