GRISBAUM, Judge,
concurring in part and dissenting in part with written reasons.
I concur in the result only of the preliminary issues. Otherwise, I must vehemently dissent.
Traver Oil Company (Traver) claims that the Greater New Orleans Expressway Commission (GNOEC) did not have a right of action and also argues the trial court erred in indicating that the drilling and oil production activities of Traver within the one-mile zone adjacent to the Causeway could damage the safety of the Causeway and motorists using it.
Traver cites La.R.S. 30:12, which vests jurisdiction over direct challenges to the issuance of a drilling permit with the Nineteenth Judicial District Court for the Parish of East Baton Rouge, where the Department of Natural Resources (DNR) is domiciled. I agree with the GNOEC and the majority that this position lacks merit. The GNOEC is not challenging the issuance of the drilling permit to Traver but is challenging Traver’s right to conduct dangerous commercial marine operations within one mile of the Causeway.
The wording of La.R.S. 30:12 provides that suit may be brought against the assistant secretary of the Department of Conservation.[1] In a similar suit the Third *1216 Circuit in Theriot v. Mermentau Resources, Inc., 385 So.2d 939 (La.App. 3d Cir.1980), held that a suit by a neighboring landowner seeking to enjoin the drilling of a disposal well permitted by the Commissioner of Conservation was in effect an attack on the permit issued by the Commissioner and that, under La.R.S. 30:12, such suit could be brought only in East Baton Rouge Parish. I respectfully disagree with the rationale of this case, being of the opinion that it reaches out to toss a plaintiff out of court notwithstanding the command of La. Const, art. I, § 22.[2] Here, there is no specific attack on the permit issued by the Department of Conservation; accordingly, I agree with the ruling of the trial court in that La.R.S. 30:12 is not applicable and that the Twenty-Fourth Judicial District Court properly assumed jurisdiction. Even were I to ascribe to the rationale of Theriot, however, I would reach the same conclusion. In denying the GNOEC’s petition for reconsideration of the issuance of the Coastal Use Permit, the DNR concludes as follows:
The Department is concerned with the navigation-safety issue that has been raised by petitioner [GNOEC]. Such issue falls within the purview of the U.S. Coast Guard and the U.S. Corps of Engineers. As previously stated, this Department does not have any specific rules, regulations or guidelines which deal with the navigation-safety issue raised herein.
By this language, the DNR has specifically disclaimed any jurisdiction over the navigation-safety concerns raised by the GNOEC. Elemental due process dictates that one cannot be stripped of his rights by the expediency of removing the forums empowered to uphold those rights. Accordingly, again, the trial court possessed jurisdiction.
Traver also has urged that the GNOEC has no right of action to seek injunctive relief, citing La.R.S. 30:204(F) and 30:218.[3] Falling within the context of a statute detailing permit procedures, the obvious purpose of the former provision is to prevent state agencies other than the Department of Conservation from establishing additional permit requirements applicable to persons holding a Department of Conservation permit. The latter provision, appearing in the context of statutes governing what shall transpire when two or more persons claim the same minerals on state lands, directs only that a claimant’s ordinary remedy is sequestration of the product and that the extraordinary remedy of enjoining exploration is unavailable. Thus, La.R.S. 30:218 speaks to the instant dispute not at all. No provision in either of the two sections prohibits the issuance of an injunction to protect the public safety and welfare. Accordingly, the trial court did not err in upholding the GNOEC's right of action.
*1217 I now take up the issues relative to in-junctive relief. These bifurcate into two questions:
(1) Whether the trial court erred in maintaining its preliminary injunction as a permanent injunction, and
(2) Whether the trial court erred in finding the specific conditions attached to the injunction and allowing, first, drilling and, later, production eliminate the threat of irreparable harm.
As to the first question, I concur with the trial court and the majority in that the issuance of an injunction by the trial court, in the absence of a statute providing this remedy, necessarily entails the finding that Traver’s activities pose a threat of irreparable injury. La.C.C.P. art. 3601.[4] I fully concur with this finding. The threat to safety and the potential for loss of life (about 16,000 automobiles cross the bridge each day) created by Traver’s activities are just such losses as “cannot be adequately compensated in money damages or for which such damages cannot be measured by a pecuniary standard” so as to threaten irreparable harm. Anzelmo v. La. Comm’n on Ethics for Public Employees, 435 So.2d 1082, 1087 (La.App. 1st Cir.1983); Reed v. Allison & Perrone, 376 So.2d 1067, 1069 (La.App. 4th Cir.1979). Although the threatened irreparable injury will befall third parties or the public generally, an entity charged with their service may obtain injunctive relief. South Central Bell Telephone Co. v. F. Miller & Sons, Inc., 382 So.2d 264, 265 (La.App. 3d Cir.1980); State Bd. of Educ. v. Anthony, 289 So.2d 279, 284 (La.App. 1st Cir.1973). Present the threat of irreparable injury, even otherwise lawful activities may be enjoined. Salter v. B.W.S. Corp., Inc., 290 So.2d 821, 824-25 (La. 1974). Both legally and factually, then, the grant of the injunction appears correct. Accordingly, the court did not err.
The harder question — the one with which both I and the majority must chiefly grapple — is whether the conditions set forth in the injunction so .defeat or diffuse the threat of irreparable harm that marine operations might safely be permitted. After a careful review of the record, I find that these conditions, at best, somewhat ameliorate the danger but by no means eliminate the risk or reduce it to an acceptable level. In concluding otherwise, I find the trial court fell victim to fundamental errors of fact and law.
The most serious of these — the most inescapable — is the court’s, and now the majority’s, utter and pervasive failure to grasp the danger wrought by sheer proximity. Traver’s well is 1338 feet from the Causeway (just over one-quarter mile, one mile equalling 5280 feet). Given this fact, simple arithmetic demonstrates much of the danger: at one mile per hour, a vessel covers one-fourth mile in one-fourth of an hour, or 15 minutes; at four miles per hour, it covers the distance four times faster, or in three minutes and 45 seconds. This is precious little reaction time.[5] Moreover, the problem is exacerbated by the 1000-foot (not 1338-foot) alarm perimeter, by the fact that CAWS (Collision Avoidance Warning System) devices[6] will almost certainly not be at the nearest point on the tug-barge transports, by the 100-foot accuracy of the system, and by the devices being polled only intermittently, apparently *1218 once every 45 seconds.[7] Given these variables, reaction time could easily be cut to around two minutes. And given that, whatever else is clear from the May 15 hearing, it is certain that no practiced, definitive response exists to an alarm, I deem it clear that two minutes is nowhere near a safe reaction time.[8]
I am reinforced in this view by the unre-butted testimony of Mr. Robert Lambert, general manager of the Greater New Orleans Expressway Commission, that the U.S. Coast Guard was of the opinion that only a one-and-one-half mile alarm zone could provide an adequate buffer for emergency response. Mr. Robert Smothers, who helped design the warning system, was of the same opinion. The one-mile zone that was eventually put in place was a commercial compromise, a concession to shell dredgers. Thus, as originally implemented, the Prohibited Zone already represented a compromise in safety. Confronted by an alarm zone diminished by about 80 percent in addition (down to about 1000 feet),[9] we are asked to deem it, too, safe. I simply cannot conceive that less than one-sixth of the original mile-and-a-half safety buffer is safe enough. Nor can I agree that having a patrolman, distracted by heat by day or impaired by darkness at night, or by occasional patchy fog, watch over this seriously pared buffer zone appreciably helps.
As Traver’s own expert testified, “the whole thing is based on response.” No amount of intensive scrutiny can replace the time buffer on which the Causeway’s safety is based. This was precisely Mr. Sheldon G. Held’s point when he summarized:
Now, there has been a great deal done here where an attempt to ameliorate the proximities and to some extent I think its [sic] been done. There’s been some amelioration to this proximity problem. But, it’s a little bit like saying speed at any price, meaning that I don’t think you can make this operation safe. It’s unsafe in the nature of it due to the proximity to the Causeway. And I will agree that a great deal of effort has been made to ameliorate that.... I don’t think it changes much because there is too much given to human and mechanical failure here which can happen. And if it happens within a thousand feet there isn’t much anybody can do in a thousand feet to react to it no matter how many vessels you have out there.
The trial court, focusing only on Held’s inability to regurgitate some of the details of its prior judgment, too hastily dismissed his well-reasoned opinion.
Repeatedly at the May 15 hearing and again on July 15, counsel for Traver attempted to disparage the risk of proximity by comparing it to the dangers attending the north and south marine passes on the Causeway, where the one-mile Prohibited Zone must of necessity be transited. However, since the bridge supports at these points are protected by fenders, the situations are not analogous. More importantly, however, the argument is vitiated by a fundamental error. That is, the risks brought about by Traver’s activities are not comparative with but additive to those at the bridge passes. And, as Held points out, the Traver risks are prompted by convenience, not by necessity, as are those at *1219 the passes, which, realistically, are required lest this State unreasonably interfere with interstate commerce.
Essentially, the court’s decrees are premised on a factual scenario that outright dismisses the most serious danger posed by Traver’s operations: proximity. Meticulously documented by expert testimony, this danger, in its essence, is ascertainable by common sense alone and is uncontro-verted in the record. Yet when Mr. Held summarizes its nature, he is neither heeded nor met with any argument but, in the court’s reasons, is merely ignored as testifying in terms “very general.” I have but one quibble with this: I know one cannot banish risk by ignoring its existence. Moreover, since Traver now proposes both to rework the well and to lay a pipeline, the risk can only increase in correlation to the increased number of vessels in the area. The record is clear on this point, and the majority’s failure to acknowledge the increased risk is inexplicable.
Beyond its failure to appreciate the overall dangers posed, the court errs also at a practical level, failing to appreciate or to counter the conflict of interest inherent in having Traver appoint its own rig “inspectors,” a privilege gained in the vacuum between the judgment’s failure to specify any qualifications and the Department of Wildlife and Fisheries’ unwillingness to draft its own. The resultant de facto power of appointment no doubt contributed to the recurrent on-site interpretations of judgment ambiguities in Traver’s favor. Having found a risk of irreparable injury, it became the district court’s duty and now has become this Court’s duty to ensure that the risk is eliminated — not in theory but in fact. We cannot close our eyes and trust in paper fences planted in optimism.
The court’s unfounded denial of the risk is compounded by concomitant errors of law. The first comes at the May 15 hearing, when the court disallows testimony as to the utility gained by drilling 1338 feet from the bridge instead of farther away. Under an injunction issued on an abuse-of-right theory, it is clear such testimony is pertinent to the case. That is, the harm done neighboring parties is to be balanced against any utility gained by a party’s disruptively exercising its right's. Illinois Cent. Gulf R.R. Co. v. Int’l Harvester Co., 368 So.2d 1009, 1013-15 (La.1979); Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353, 1368-69 (La.1977); Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (La.1919). Here, the omission of the comparative data is especially suspect since we know a well could be directionally drilled from over a mile away. Traver’s predecessor, Pogo, did precisely this. Granting that Traver by its lease had a right to drill, this right is in no manner an absolute right.[10] Indeed, it is a right of much less stature than the constitutional right of free commerce to which Traver’s counsel attempts to analogize the right to drill. When Traver’s right is weighed against those of the GNOEC and the public generally, it becomes evident that the safety of the motoring public must prevail.
The second error is apparent in the court’s close questioning of Mr. Held as to the likelihood of everyone on two tugs falling asleep at the same time. This focus of the court is inappropriate for two reasons. First, the CAW System is itself designed to protect against unlikely occurrences: marine collisions with the bridge. Second, legally, the plaintiff, while he must show a reasonable probability that the act sought to be enjoined will occur, need not show that the danger devolving from the act or acts is likely to come about. Rather, the magnitude of the risk, should it occur, may alone warrant injunctive relief. La. Livestock Sanitary Bd. v. Prather, 301 So.2d 688, 691 (La.App. 3d Cir.1974); Salter v. B.W.S. Corp., Inc., 290 So.2d 821, *1220 825 (La.1974). Because of the grave nature of the instant risk, I find the court’s focus on only the probability of its ever occurring especially inappropriate.
Beyond its bravado of optimism and its innumerable conditions, I find the trial court’s judgment ultimately fails to remove the risks enjoined against and thus leaves intact an unacceptable risk of irreparable harm. I therefore would set aside those conditions, maintaining the injunction against all marine operations within the one-mile Prohibited Zone by Traver Oil. Although it appears extremely doubtful that any conditions could remove the risk of irreparable injury created by such proximate operations, out of an abundance of caution I would remand for an evidentiary hearing on this issue, as well as on the feasibility of drilling farther from the Causeway for purposes of completing production activities. If, on such hearing, the court confected further conditions that attempt to eliminate the risk of irreparable harm and if those conditions at all concerned the actions of the Department of Wildlife and Fisheries (which apparently operates and controls the CAW System), it appears the Department must then be a party to this suit. Finally, should the court find that no conditions can counter the dangers posed, I would direct it to receive evidence on and then detail procedures as to how the well should be permanently capped.
In scurrying obliviously to decide this matter contrary to the facts self-evident in this record, the majority spins a spiralling web of tenacious optimism and outright fantasy that ensnares and then casts out the very public interest we should safeguard. Thus, although I agree with the majority on the preliminary issues, I take no part in its ultimate conclusion. I emphatically dissent.

. In pertinent part, La.R.S. 30:12 reads as follows:
A. (1) A person who is aggrieved by any law of this state with respect to conservation of oil or gas, or both, or by a provision of this Chapter, or by a rule, regulation, or order made by the assistant secretary of the office of conservation hereunder, or by an act done or threatened hereunder, and who has exhausted his administrative remedy, may ob *1216 tain court review by a suit for injunction or judicial review against the assistant secretary as defendant.
(2) Suit for review shall be instituted in the district court of the parish in which the principal office of the assistant secretary is located and must be brought within sixty days of the administrative action that is the subject of the suit. In cases of judicial review of adjudication proceedings, the sixty days shall begin to run after mailing of notice of the final decision or order, or if a rehearing is requested within sixty days after the decision thereon.

. La. Const, art. I, § 22 reads as follows:
All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.

. La.R.S. 30:204(F) provides thus:
The issuance of the permit by the commissioner of conservation shall be sufficient authorization to the holder of the permit to enter upon the property covered by the permit and to drill in search of minerals thereon. No other agency or political subdivision of the state shall have the authority, and they are hereby expressly forbidden, to prohibit or in any way interfere with the drilling of a well or test well in search of minerals by the holder of such a permit.
La.R.S. 30:218 provides thus:
No injunction shall issue against lessees of the state or state employees to restrain exploration for minerals on state lands. In all cases plaintiffs remedy shall be judicial sequestration of the product of the exploration or its proceeds until the rights of all claimants are determined.

. La.C.C.P. art. 3601, in pertinent part, reads:
An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law....

. I note also that while under condition B(6) of the amended judgment a Traver vessel is not to exceed two knots while in the Prohibited Zone, under condition B(22) the automatic alarm does not reengage unless the vessel exceeds four miles per hour.

.Required by La.R.S. 34:851.24(J) on all members of certain categories of vessels operating in Lake Pontchartrain, these devices both enable the Department of Wildlife and Fisheries automatically to track the vessels and contain an alarm that automatically is triggered under given conditions, especially among which are a vessel’s speeding and a vessel’s breaching the one-mile Prohibited Zone extending from either side of the Causeway.

. This is as provided by condition B(22) of the amended judgment. I say "apparently” because, notwithstanding both the court’s and Traver's recurrent allusions to a modified warning system, there is no testimony that such a system exists or, if it does, as to just how the modified system works. We have only how the judgment says it should function.

. In the one instance in the record where a patrolman relates what transpired when he did observe unauthorized marine activity at the drill site, it is all too apparent that much time was devoted, first, to verifying the activity and, then, to discussing it by radio. This time elapsed with no contingency measures being taken. Moreover, only at the time of this episode did the patrolman realize he had misplaced a barge that earlier had been moored to the rig. He had not seen it leave but it was in fact gone. Obviously no response time at all exists if one, as here, fails to diagnose a problem to begin with.

.This, again, assumes a modified system exists. See n. 7, supra.

. As Mr. Justice Holmes so keenly observed many years ago, “All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached.” Hudson County Water Co. v. McCarter, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828 (1908).